UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Ronald J. Hylla,

Plaintiff,

vs.

Transportation Communications
International Union,

Defendant.          Civ. No. 06-4700 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Motion of the Defendant Transportation Communications International Union ("Union") to Dismiss, or for Summary Judgment, and the cross-Motion of the Plaintiff Ronald J. Hylla ("Hylla") for Summary Judgment.  A Hearing on the Motions was conducted on May 10, 2007, at

which time, Hylla appeared by James T. Hansing, Esq.; and the Union appeared by Carmen R. Parcelli, and Michael W. Unger, Esqs.  For reasons which follow, we recommend that Hylla's Motion be denied, and that the Union's Motion be granted.

## II. <u>Factual and Procedural Background</u>

This action arises out of the Union's decision to discipline Hylla, who was serving as a Union officer, for alleged misconduct, by removing him from his Union office, and by barring him from holding any future office in the Union.  Hylla alleges that the Union violated his right to engage in free speech and expression, contrary to Title I of the Labor-Management Reporting and Disclosure Act ("LMRDA"), see, <u>Title 29 U.S.C. §411</u>, and engaged in common law defamation.  See, <u>Complaint</u>, <u>Docket No. 1</u>.

Hylla was a member of the Union from 1976 until 2007, and in May of 2004, he became the elected Senior Vice General Chairman of System Board 46 ("System Board"), which is the intermediate governing body of the Union that encompasses approximately nineteen (19) local unions.   See, <u>Declaration of Hylla</u>, <u>Docket No. 15</u> at pp. 1-2.  At all times relevant to this action, Larry Swanson ("Swanson") was the General Chairman of the System Board, Tom Truhler ("Truhler") was the Vice

General Chairman, and Kelly Gilbertson ("Gilbertson") was an office administrative employee with the System Board.  <u>Id.</u>

On November 14, 2005, Swanson contacted the International President of the Union, Robert A. Scardelletti ("International President"), concerning several incidents of allegedly inappropriate behavior by Hylla.  See, <u>Declaration of Kraus</u>, <u>Docket No. 11</u>, Exhibit 9, at pp. 58-62.  As a result of that conversation, on November 16, 2005, Swanson telephoned Hylla, who had been in Chicago on a business trip, and told him not to return to work at the System Board office until he received a telephone call instructing him otherwise.  <u>Id.</u> at p. 201.

In response to Swanson's concerns, the International President summarily suspended Hylla from office by a letter dated November 18, 2005, that charged him with conduct unbecoming an officer, in violation of Article 13, Section 10(a) of the Union constitution, and insubordination, and dereliction of duty, in violation of Article 5, Section 2(a), and his oath of office.  <u>Id.</u> at Exhibit 2.  In that letter, the International President explained to Hylla that he was suspended pending a request for a Hearing on charges that he failed to comply with orders given by Swanson, on August 30 and 31, 2004; December 7 and 13, 2004; and November 3 and 14, 2005; and on charges that, on November 14, 2005, he said "Well, f*** you" to Swanson

when he attempted to discuss those incidents with Hylla, and that he told Gilbertson to "watch [her] back" in a threatening manner.  Id.

On December 1, 2005, Hylla made a timely request for a Hearing.  Id. at Exhibit 3.  Prior to the Hearing, the International President notified Hylla, by letter dated December 15, 2005, that he had received reports that, despite being suspended from his office, Hylla had contacted a District Chairman concerning Union business.  Id. at Exhibit 6.  On that same date, the International President sent a letter to all District Chairpersons of the System Board (the "December 15th Letter"), informing them of Hylla's suspension from performing Union business, and enclosing a copy of the letter to Hylla dated November 18, 2005.  Id. at Exhibit 7.  A Hearing, at which Hylla was present and testified, was held before a Union Hearing Officer ("Hearing Officer") on January 19, 2006.  Id. at Exhibit 9.

On February 3, 2006, the Hearing Officer issued Findings and Recommendation in which he addressed the individual charges brought against Hylla, and recommended that he be found not guilty of failing to follow orders on August 30, 2004, but guilty of all other charges, as well as being in violation of conduct unbecoming an officer, insubordination, and dereliction of duty.  Id. at Exhibit 10.  The Hearing Officer further recommended that Hylla be removed from office, and declared permanently

- 4 -

ineligible to hold any Union office in the future.  Id.  The International President sent Hylla a letter, on February 9, 2006, see, Docket No. 11, in which he adopted the Hearing Officer's Findings and Recommendation.

On February 17, 2006, the International President sent a second letter to all District Chairpersons of the System Board (the "February 17th Letter"), informing them of his decision, and enclosing a copy of the letter to Hylla dated February 9, 2006.  Id. at Exhibit 12.  On March 10, 2006, Hylla made a timely appeal of the International President's decision to the Executive Counsel of the Union, and a Review Hearing by the Executive Counsel was held on June 27, 2006, which sustained the International President's decision.  Id. at Exhibits 13-15.

Hylla brought this action on November 30, 2006, by filing a Complaint.  See, Docket No. 1.  On January 31, 2007, the Union brought a Motion to Dismiss, or for Summary Judgment, see, Docket No. 8, and, on March 13, 2007, Hylla moved for Summary Judgment.  See, Docket No. 13.

## III.  Discussion

The Union seeks the dismissal of Hylla's claims under the LMRDA, and for defamation, or alternatively, the grant of Summary Judgment, in its favor, while Hylla seeks Summary Judgment on his LMRDA claims.  We address each issue below.

- 5 -

A.    <u>The LMRDA Claim</u>.

1.    <u>Standard of Review</u>.  The Union's Motion to Dismiss is predicated, in part, on the asserted absence of Federal subject matter jurisdiction.  A party may challenge, at any time, a Court's jurisdiction over the subject matter of a controversy, under Rule 12(b)(1), Federal Rules of Civil Procedure, since a defense, on subject matter jurisdiction grounds, cannot be waived.  See, <u>Moubry v. Independent School District No. 696</u>, 951 F. Supp. 867, 882 (D. Minn. 1996), citing <u>Northwest Airlines, Inc. v. Transport Workers</u>, 451 U.S. 77, 95 (1981); <u>Bueford v. Resolution Trust Corp.</u>, 991 F.2d 481, 485 (8th Cir. 1993)("Lack of subject matter jurisdiction * * * cannot be waived[;] [it] may be raised at any time by a party to an action, or by the court <u>sua sponte</u>.").

"In order to properly dismiss an action under Rule 12(b)(1), the challenging party must successfully attack the Complaint, either upon its face or upon the factual truthfulness of its averments."  <u>Moubry v. Independent School Dist. No. 696</u>, supra at 882, citing <u>Titus v. Sullivan</u>, 4 F.3d 590, 593 (8th Cir. 1993); <u>Osborn v. United States</u>, 918 F.2d 724, 729 n. 6 (8th Cir. 1990).  If the defendant brings a facial challenge -- a challenge that, even if truthful, the facts alleged in a Complaint are insufficient to establish jurisdiction -- the Court reviews the pleadings alone, and "the

non-moving party [is afforded] the same protections that it would receive under a Rule 12(b)(6) motion to dismiss." Carlson Holdings, Inc. v. NAFCO Ins. Co., 205 F. Supp. 2d 1069, 1073 (D. Minn. 2001), citing Titus v. Sullivan, supra at 593; Osborn v. United States, supra at 729 n. 6.   Accordingly, "[t]he court presumes that all of the factual allegations in the complaint concerning jurisdiction are true and will not dismiss the claims unless the plaintiff fails to allege an essential element for subject matter jurisdiction." Id.

However, in factual challenges to subject matter jurisdiction -- contending that the allegations in the Complaint, that are intended to establish jurisdiction, are insufficiently supported by the facts -- the Court "may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of 12(b)(6)." Id.   When a plaintiff's "'allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof,'" "[a]nd * * * for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence.'" Zunamon v. Brown, 418 F.2d 883, 886 (8th Cir. 1969), quoting McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936).

If, on review, we find that we possess subject matter jurisdiction over the Plaintiff's LMRDA claim, then we must consider whether Summary Judgment is appropriate.  Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005).

Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue.  See, Eide v. Grey Fox Technical Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003); Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003); United Fire & Casualty Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party.  See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Planned

Parenthood of Minnesota/South Dakota v. Rounds, 372 F.3d 969, 972 (8th Cir. 1004);

Fenney v. Dakota, Minnesota & Eastern R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003)

As Rule 56(e) makes clear, once the moving party files a properly supported

Motion, the burden shifts to the nonmoving party to demonstrate the existence of a

genuine dispute.  In sustaining that burden, "an adverse party may not rest upon the

mere allegations or denials of the adverse party's pleading, but the adverse party's

response, by affidavit or as otherwise provided in this Rule, must set forth specific

facts showing that there is a genuine issue for trial."  Rule 56(e), Federal Rules of

Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v.

City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).

Moreover, the movant is entitled to Summary Judgment where the nonmoving

party has failed "to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  Celotex Corp. v.

Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir.

2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond

v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000).  No genuine

issue of fact exists in such a case because "a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts

immaterial." <u>Celotex Corp. v. Catrett</u>, supra at 323; see also, <u>Sallis v. University of</u> <u>Minnesota</u>, 408 F.3d 470, 474 (8th Cir. 2005); <u>Davis v. U.S. Bancorp</u>, 383 F.3d 761, 768 (8th Cir. 2004); <u>Bell Lumber and Pole Co. v. United States Fire Ins. Co.</u>, 60 F.3d 437, 441 (8th Cir. 1995).

   2. <u>Legal Analysis.</u> The Union argues that we lack subject matter jurisdiction over the Plaintiff's LMRDA claim, since Title I of the LMRDA does not protect union members or officers found guilty of making threats, or of engaging in insubordinate conduct, from disciplinary action or, alternatively, urges that Summary Judgment is appropriate as it was reasonable to discipline Hylla for violating the rules, and constitution, of the Union. Hylla counters that he has met his burden by establishing that his conduct was protected by the "free speech" provision of the LMRDA.

  Title I of the LMRDA is known as the union workers' "Bill of Rights," and guarantees certain free speech, and due process protections, to union members as follows:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or

> upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Title 29 U.S.C. §411(a)(2); see also, Jones v. United Parcel Service, Inc., 461 F.3d 982, 996 (8th Cir. 2006); Bradley v. American Postal Workers Union, 962 F.2d 800, 801 (8th Cir. 1992).

Union members can enforce the guarantees of Title I by bringing a private civil action in Federal Court, see, Title 19 U.S.C. §412; see also, Calhoon v. Harvey, 379 U.S. 134 (1964), and it is unlawful for a union to discipline members for exercising rights to which they are entitled under the LMRDA.  See, Title 19 U.S.C. §529.

While the removal of an appointed union official does not give rise to a viable claim under Title I of the LMRDA, the removal of an **elected** official does present a viable claim that can be heard by a Federal Court.  See, Behr v. Fortier, 2007 WL 951665 at *4 (D. Minn., March 27, 2007), citing Sheet Metal Workers' Intl. Assoc. v. Lynn, 488 U.S. 347, 355 (1989); see also, Morris v. Hoffa, 361 F.3d 177, 193-94 (3d Cir. 2004); Gilvin v. Fire, 259 F.3d 749, 757-58 (D.C. Cir. 2001).  In Sheet Metal

Workers' International Association v. Lynn, supra at 355, the Supreme Court justified

that distinction with the following explanation:

> [T]he potential chilling effect on Title I free speech rights
> is more pronounced when elected officials are discharged.
> Not only is the fired official likely to be chilled in the
> exercise of his own free speech rights, but so are the
> members who voted for him. * * * [Congress] recognized
> that democracy would be assured only if union members
> are free to discuss union policies and criticize the
> leadership without fear of reprisal.

In Lynn, an elected official was terminated by his union after he was openly critical

of a proposed dues increase at a special meeting with union members.  Id. at 350.  The

Supreme Court concluded that a cause of action existed under the LMRDA, as the

termination of the plaintiff official was an unfair penalty that denied the union

members, who had elected him, of the representative of their choice.  Id. at 355; see

also, Gilvin v. Fire, supra at 749 (finding that an elected union official had stated a

Title I free speech claim when he alleged that he was suspended for writing letters to

union leadership criticizing union fiscal policy).

Although the right of a union member to express himself under Title I of the

LMRDA is nearly unlimited, the right of a union official is more circumscribed, as he

is obligated to carry out the union's programs and policies.  See, Maceira v. Pagan,

- 12 -

649 F.2d 8, 14 (1ˢᵗ Cir. 1981), citing <u>Newman v. Local 1101 Communications Wkrs.</u>, 570 F.2d 439, 445 (2d Cir. 1978).  Thus, a union member, who is also an officer, may not "sabotage or subvert its policies in the name of free speech," or engage in "activities diametrically opposed to the performance of his specified duties."  <u>Id.</u>, quoting <u>Sewell v. Grand Lodge of Int'l Assoc. of Mach. & Aeor. Wkrs.</u>, 445 F.2d 545, 551 (5ᵗʰ Cir. 1971).

In  <u>Maceira v. Pagan</u>, supra at 15, the Court of Appeals for the First Circuit considered three (3) factors in examining the fine line that separates free speech, and insubordination, for union officers:  (1) "the precise nature of the activity for which the official has been disciplined," (2) "the role of the official within the union," and (3) "the extent to which any legitimate union interest may be protected by 'reasonable rules'" that have been promulgated by the union in conformity with the LMRDA.  The Court held that, when an elected officer's disagreement with union policies interfered with his ability to perform his duties, then his insubordination would not be protected as free speech under Title I.  <u>Id.</u>; see also, <u>Weyhmueller v. Janitors  Union Local No. 1</u>, 509 F. Supp. 992, 998 (D.C. Ill 1981).

The Union argues that the <u>Lynn</u> decision should be construed narrowly to protect elected officials only when they are exercising their Title I free speech rights

**on behalf of the electorate**, while Hylla's comment, on November 14, 2005, of "f**k you" to Swanson, dealt exclusively with personal matters, and so was not protected by Title I.  The Union further argues that Hylla's statement to Gilbertson, that she should watch her back, was a threat that can not be construed as protected speech under the meaning of Title I.  Hylla challenges this interpretation, and claims that his statement to Swanson came in the course of a heated argument about a Union policy that Hylla claimed targeted him, but not other union officials, in a discriminatory and unprofessional way.

According to Hylla, he decided to express his concern to Swanson, as his supervisor, that a new attendance policy would affect the manner in which he was able to execute his duties and responsibilities, as an elected System Board officer, and, in the course of that discussion, he used an obscenity that reflected a form of crude, but familiar office banter, between the two men.  Moreover, Hylla argues that he has had a long history of cordial relations with Gilbertson, and his warning to her could not reasonably be construed as a genuine threat of bodily harm.

In support of his position that his actions were of general interest to the Union membership, and therefore, are protected as free speech, Hylla cites Salzhandler v. Caputo, 316 F.2d 445 (2d Cir. 1963), cert. denied, 375 U.S. 946 (1963). and Kelsey

v. Philadelphia. Local 8, IATSE, 294 F. Supp. 1368 (E.D. Pa. 1968), cert. denied, 397 U.S. 1064 (1970).  In Salzhandler v. Caputo, supra at 447, the financial secretary of a union uncovered evidence that the union president was embezzling funds, and subsequently distributed a flier to the union membership referring to several union members, including the president, as "thieves, scabs, robbers, scabby bosses, bums, pimps, f-bums, [and] jailbirds."  As a result, the union removed the secretary from office for libeling and slandering a fellow official.  Id. at 447-48.  The plaintiff secretary brought suit under the LMRDA and, in weighing his claim, the Court noted that the success of a union "depends in large measure on a unity of purpose and sense of solidarity among its members," and determined that the secretary should not have been disciplined since he had made his accusations based upon the general financial interests of the union.  Id. at 450-51.

The Court in Kelsey, supra at 1370, relied on Salzhandler in considering the complaint of an elected union official, who was suspended for "conduct unbecoming an officer," when he allegedly offered to fight a superior official who was solely responsible for giving out job assignments to union members, after his superior had declined to give the suspended officer a specific job assignment.  The union held an Administrative Hearing, and found the plaintiff official guilty of insubordination.  The

- 15 -

plaintiff filed a complaint in Federal Court, alleging that his statements were protected by the LMRDA.  Id. at 1372. The Court agreed, and concluded that it held subject matter jurisdiction, and that the plaintiff's statement to his supervisor had, in fact, represented an expression of his willingness to fight for ideals that were of importance to the entire union membership, as "[w]ho gets referred for what jobs, and by what procedure is a matter of the utmost importance to the members of [a] union that runs a hiring hall." Id. at 1374-75.

Similarly, in Marshall v. Local Union No. 815, United Textile Workers, 479 F. Supp. 613, 615 (E.D. Tenn. 1979), an elected union official, who was displeased by an anonymous pamphlet that was being distributed among union members on an election day, approached a second official, who he believed to be responsible, and accused him of "*** lying," called him "*** a s o a b ***," and threatened to "*** stomp ***" the official's "*** a ***." [All ellipses in original].   The Court found that the official's speech was protected, and noted that, although the language used by the plaintiff was undoubtedly exceedingly vulgar and threatening, the statements, and possibly even the emotions that gave rise to the statements, originated in incidents relating to union affairs, and no other issue had been addressed by either party in their conversation.  Id.

A Court in this District has approvingly cited the <u>Salzhandler</u> decision, in <u>Stark v. Twin City Carpenters District Council</u>, 219 F. Supp. 528, 529-30 (D. Minn. 1963), in the context of an officer who was disciplined by his union, and charged with slander, after making comments at a union meeting that addressed rumors concerning the disciplinary suspension of a union member.  In finding that the LMRDA protected such statements, the Court quoted the decision in <u>Salzhandler</u> that "[t]he legislative history and extensive hearings which preceded the enactment of the [LMRDA] abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain."  <u>Id.</u> at 535, quoting <u>Salzhandler v. Caputo</u>, supra at 449. Thus, the consensus among those Courts that have considered the issue appears to be that, "even a loosely-worded threat to a fellow union member may not at times be sufficient to justify punishment," as long as the topic under discussion relates to general union business.  <u>Mallick v. International Brotherhood of Electrical Workers</u>, 644 F.2d 228, 235 (3d Cir. 1981), citing <u>Kelsey v. Philadelphia Local No. 8, IATSE</u>, supra at 491.

Although they each offer a different interpretation of the events of November 14, 2005, the parties do not appear to dispute the basic operative facts.[1]  On that date, Hylla confronted Swanson, and asked his superior about the documentation of his attendance on a weekly schedule that was maintained by Gilbertson, and Swanson informed Hylla that he had instructed Gilbertson to make daily attendance records on all System Board officers.  See, <u>Declaration of Kraus</u>, supra at Exhibit 9, pp. 51-52, 178-79.  Hylla expressed his belief that he was being singled out, and declared that, in response to the new policy, he was going to start maintaining records in which he would monitor Gilbertson's attendance.  <u>Id.</u> at pp. 55, 183.  Swanson objected to that proposal as a waste of time, and informed Hylla that he was not open to further conversation on the subject, at which point Hylla replied "f**k you."  <u>Id.</u> at pp. 55, 186.  Swanson then left the office without further contact with Hylla and, when he returned later that day Gilbertson was visibly upset, and told him that she felt that Hylla had threatened her by walking into her office, throwing down a stack of papers on her desk, and telling her to "watch your back."  <u>Id.</u> at pp. 56-57.

---

[1]Hylla has submitted an Affidavit in which he questions the interpretation of the events of November 14, 2005, which was drawn by the Hearing Officer, see, <u>Declaration of Hylla</u>, <u>Docket No. 15</u>, however, he does not deny the occurrence of any of the underlying events. See, <u>Plaintiff's Memorandum in Opposition</u>, <u>Docket No. 16</u>, at p. 3.

Even applying the indulgent standard that Courts extend to afford protection to elected union representatives under Title I of the LMRDA, on those uncontroverted facts, as contained in the Record before us, we conclude that Hylla's comment to Swanson did not arise out of, or relate to, a discussion of Union affairs, and therefore, was not protected speech.  The conversation that led to Hylla's unfortunate statement began with Hylla's inquiry into an attendance policy that had been recently initiated by Swanson, and that affected only the internal administration of the System Board office.  Moreover, Hylla acknowledges that he questioned the policy because he felt as if he had been unfairly singled out from other System Board officers who, allegedly, were not subject to this policy.

As we have noted, it is undisputed that union members, including elected officers, are entitled to "question and complain" about union policies.  See, <u>Stark v. Twin City Carpenters District Council</u>, supra at 535.  However, by Hylla's own admission, the policy at issue only affected those employees who worked in the System Board office, and had, as its exclusive purpose, the confirmation of the attendance records of those individual employees.  Moreover, the dispute between Hylla, and Swanson, arose from Hylla's belief that the policy was being enforced only against him, which affirms that he did not intend that his "questioning and

- 19 -

complaining" about the policy would have an impact on the Union membership as a whole.

These circumstances are clearly distinguishable from those in <u>Kelsey</u>, and <u>Salzhandler</u>, where complaints about job allocations, and embezzlement of union funds, respectively, expressed concerns relating to the general well-being of the union, and its members. Nothing in the Record before us suggests that the attendance policy at issue had any potential impact on the general Union membership, or that it represented anything other than an administrative policy to enable Swanson to keep track of the hours of his employees. Accordingly, we conclude that Hylla's statement to Swanson was not protected free speech under Title I.

We also conclude that Hylla's encounter with Gilbertson is not protected by Title I of the LMRDA. Notably, Hylla had not discussed the attendance policy with Gilbertson before he entered her office, he forcefully placed files down on her desk, and he made a statement that she perceived as threatening. Significantly, Gilbertson was a clerical employee of the Union, not Hylla's peer or superior, and she had no authority to change, or even to comment on the policy, that was earlier discussed by Hylla and Swanson. Although in <u>Marshall</u>, supra at 615, the Court found that even angry words could be protected as long as the emotions arose in the context of a

discussion of union policies, here, Hylla does not claim that he and Gilbertson had been discussing the attendance policy before he entered her office, and further, he concedes that Gilbertson played a purely passive role in enforcing the policy that had been initiated, and enforced, by Swanson.  We can conceive of no possible Union interest that Hylla could have in addressing Gilbertson with such words, particularly in that context, and accompanying those words with a gesture that she perceived as a threat of violence, coupled with forceful behavior.  As a consequence, we find that Hylla's actions toward Gilbertson constituted a threat that was not protected as free speech under the LMRDA.

Even if we had found that Hylla's use of an obscenity to Swanson, and the threat to Gilbertson, was free speech within the meaning of the LMRDA, and therefore, vested us with subject matter jurisdiction, as we have previously noted, Title I provides that a union is permitted to "adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."  Title 29 U.S.C. §411(a)(2).

Here, Article 5, Section 2(a), of the Union Constitution bars officers and members from engaging in conduct that "is designed * * * to defeat or subvert the

- 21 -

lawfully declared and established policies and objectives of the Union."  See,

Declaration of Kraus, supra at Exhibit 1.  In addition, Article 13, Section 10(a), of the

Constitution gives the International President the power –

> to suspend, expel, or otherwise discipline any officer,
> committee member or member: (1) for conduct unbecoming
> an officer, committee member or member, (2) for violation
> of the Constitution * * *, (3) for violation of the policies
> established pursuant thereto, or (4) for any action
> detrimental to the interests of the Union or its members * *
> *.

See, Declaration of Kraus, supra at Exhibit 1.

Additionally, following his election, Hylla took an oath of office, in which he pledged

to "obey all orders -- coming to me -- from the constituted authorities -- of the Union."

Id.

The Union conducted an Evidentiary Hearing on the charges made by the

International President against Hylla, for Hylla's alleged violations of the Union

constitution.  Although we asked the parties at the Hearing to state their positions on

the standard of review generally afforded to Union Administrative Hearings, neither

side was able to articulate the degree of deference afforded such decisions.  Our

independent inquiry has revealed no clear standard, but we note that our Court of

Appeals has held that, "absent bad faith, we will defer to the union's interpretation of

its own constitution, provided that interpretation is reasonable and not contrary to the

constitution's express language." <u>Allen v. United Transportation Union</u>, 964 F.2d 818, 821 (8th Cir. 1992); see also, <u>Hanson v. Guyette</u>, 814 F.2d 547, 552 (8th Cir. 1987); <u>Local Union No. 1 v. Int'l Union of Bricklayers</u>, 1992 WL 118798 at *2 (D. Minn., May 27, 1992), citing <u>Pignotti v. Sheet Metal Workers' Int'l Assn.</u>, 477 F.2d 825, 831 (8th Cir. 1973).

In addition, the Court of Appeals for the Ninth Circuit has observed, in the context of the LMRDA, that the findings of a Union Disciplinary Hearing are reviewed with deference, with that deference predicated on a finding that the accused received a full and fair Hearing. See, <u>Wellman v. International Union of Operating Engineers</u>, 812 F.2d 1204, 1205 (9th Cir. 1987), citing <u>Int'l Brotherhood of Boilermakers v. Hardeman</u>, 401 U.S. 233, 246 (1971) and <u>Myers v. Affiliated Property Craftsmen Local No. 44</u>, 667 F.2d 817, 821 (9th Cir. 1982). Finally, the Supreme Court has noted that, as the intent of Congress in drafting the LMRDA was "to allow unions to govern their own affairs," and therefore, requiring a stringent standard of review would put Courts in the unenviable position of having to weigh the credibility of testimony given at Administrative Hearings on no more than a cold record. See, <u>Int'l Brotherhood of Boilermakers v. Hardeman</u>, supra at 246.

In the Findings and Recommendation that he submitted to the International President following the Hearing, at which Hylla was present and testified, the Hearing Officer considered each of the charges brought against Hylla. Id. at Exhibit 10. First, he noted that on August 31, 2004, Hylla had expressed his dissatisfaction with three (3) Memoranda that had been presented by Swanson, by throwing them at his superior officer, and saying "this is f**king bulls**t." Id. at unnumbered page 2. The Hearing Officer found that Hylla behaved with improper decorum on this occasion, and that this constituted conduct unbecoming an officer. Id. The Hearing Officer next determined that Hylla's behavior on December 7, 2004, in which he failed to report to work for two (2) days after a disagreement with Swanson, constituted additional evidence of Hylla's pattern of questioning directives from his superiors. Id. On December 14, 2004, Swanson issued a Memorandum to Hylla regarding work assignments, and the Hearing Officer found that Swanson was forced to draft the Memorandum, because Hylla would not listen to Swanson's oral explanation of certain policy decisions. Id. at unnumbered p. 3.

The Hearing Officer also found that Hylla was not guilty of failing to follow a travel directive that had been issued by Swanson, and then turned to the events of November 14, 2005. Id. The Hearing Officer found that, although the System Board

- 24 -

office had an "open door" policy that encouraged discussion among officers, and that vulgar language was occasionally used in the office during contract negotiations, Hylla's refusal to accept Swanson's explanation of the new attendance policy was inappropriate and insubordinate, and constituted additional evidence of conduct unbecoming an officer.  Id. at unnumbered p. 4.  Finally, the Hearing Officer considered Hylla's explanation of his comment to Gilbertson to "watch your back," and found that the defense offered by Hylla – namely, that he planned to keep his own personal logbook of the comings and goings of his fellow employees -- was not credible, and that he was guilty of threatening Gilbertson.  Id. at unnumbered pp. 5-6.

Ultimately, the Hearing Officer recommended that Hylla be found in violation of Article 13, Section 10(a), of the Union's constitution, for conduct unbecoming an officer, of Article 5, Section 2(a), for insubordination and dereliction of duty; was in violation of his oath of office; and that he be removed from office and be declared permanently ineligible to hold a Union office.  The findings of the Hearing Officer, including his Recommendation that Hylla be permanently barred from holding Union office, were adopted by the International President, and communicated to Hylla in a letter dated February 9, 2006.  See, Declaration of Kraus, supra at Exhibit 11.

- 25 -

Hylla has not alleged any due process violations arising from the Administrative Hearing and, upon our deferential review, we see no responsible basis upon which to reverse the considered judgment of the Hearing Officer, that was adopted by the International President, and became the final decision of the Union, that the disciplinary measure of terminating Hylla from his position as an officer was merited by his violation of several provisions of the Union constitution, and his oath of office.[2] Moreover, the constitution provided that the Union was entitled to suspend,

---

[2]In his briefing to the Court, Hylla does allege that "there were procedural irregularities and possible procedural due process concerns" raised by the Administrative Hearing, and he claims that the Union denied him access to certain documents prior to the Hearing. See, Plaintiff's Memorandum, Docket No. 16, at p. 25. However, Hylla does not allege any specific incidents, in either his Complaint or his Memorandum, and explicitly represents to the Court that he has disavowed any claims, under Section 411(a)(5) of the LMRDA, which provides as follows:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined * * * by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; C) afforded a full and fail hearing.

Title 29 U.S.C. §411(a)(5).

Based on Hylla's representation to the Court, that he is not raising any due process concerns relating to the Administrative Hearing, we find no basis to conclude that due process violations did arise.

expel, or discipline, any officer who violated its provisions, and Hylla does not allege that he failed to receive fair warning of those constitutional provisions.

Therefore, we conclude, as a matter of law, that if Hylla's statements had been protected under Title I of the LMRDA, we would still affirm the decision of the Union to terminate him from office, based on the entirety of the charges made against him at the administrative Hearing. While we recommend that the Union's Motion to Dismiss be granted, as we are convinced that we are without subject matter jurisdiction over his Complaint, we alternatively recommend that, if the District Court concludes that subject matter jurisdiction is present, that the Union's Motion for Summary Judgment be granted as to Hylla's claim under the LMRDA.

B.    The Defamation Claim. The Union argues that Hylla's claim, that he was defamed by the mailing of the December 15th and February 17th Letters to the District Chairpersons of the System Board, fails as a matter of law, because he did not make a showing of "actual malice." Hylla challenges the necessity to plead actual malice, but claims that he has met that standard, under Minnesota law, and argues that Summary Judgment is premature.[3]

---

[3]We have more than passing doubt that Hylla's defamation claim arises under Federal law, as Hylla addresses the issue under the law of the State of Minnesota.
(continued...)

      1.    <u>Standard of Review</u>. "A statement is defamatory under Minnesota law if it is communicated to a third party, is false, and tends to harm the plaintiff's reputation in the community." <u>Aviation Charter, Inc. v. Aviation Research Group/ US</u>, 416 F.3d 864, 868 (8th Cir. 2005), citing <u>Graning v. Sherburne County</u>, 172 F.3d 611, 617 (8th Cir. 1999), citing, in turn, <u>Stuempges v. Parke Davis Co.</u>, 297 N.W.2d 252, 255 (Minn. 1980); <u>Merchant Investment & Management Co., Inc. v. St. Anthony West Neighborhood Organization</u>, 694 N.W.2d 92, 95 (Minn.App. 2005). Statements are defamatory <u>per se</u>, and therefore, actionable without proof of actual damages, if

---

[3](...continued)

See, <u>Plaintiff's Memorandum of Law</u>, <u>Docket No. 16</u>, at p. 26 ("Defendant contends that plaintiff's **pendent jurisdiction defamation claim** fails as a matter of law * * *."). Here, however, we have concluded that we are without Federal Question Jurisdiction as to the LMRDA claim, and since Hylla predicated his Complaint solely upon Federal Question Jurisdiction, see, <u>Complaint, Docket No. 1</u>, at p. 1, the Court has discretion to dismiss Hylla's supplemental jurisdiction claim, as there is no longer a Federal claim pending before the Court. See, <u>Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. Of the Black Hills</u>, 141 F.3d 1284, 1286 (8th Cir. 1998)("[T]he Court has broad discretion to dismiss state law claims and counterclaims over which it has only supplemental jurisdiction if he Court dismissed all claims over which the Court had original jurisdiction which has occurred in this case."); <u>Franklin v. Zain</u>, 152 F.3d 783, 786 (8th Cir. 1998)(same), citing <u>Title 28 U.S.C. §1367(c)(3)</u>. However, neither party has addressed that issue, and the Court has discretion to address the defamation claim, even if it arises under the Court's supplemental jurisdiction, and therefore, we do not predicate our recommendation on that ground, and we examine the defamation claim under the Minnesota, and Federal labor laws.

they affect the plaintiff in his business, trade or office.  See, <u>Stuempges v. Parke Davis Co.</u>, supra at 252.

"[T]o be actionable," however, "a defamatory statement must be specific and verifiable by reference to fact."  <u>Schibursky v. IBM</u>, 820 F. Supp. 1169, 1181 (D. Minn. 1993).  Prior to 1990, both the Minnesota Supreme Court, and the Court of Appeals for the Eighth Circuit, had concluded that expressions of opinion, even if they were defamatory, were entitled to absolute protection by the First Amendment to the United States Constitution.  See, <u>Diesen v. Hessburg</u>, 455 N.W.2d 446, 450-51 (Minn. 1990)("[E]xpressions of opinions are not actionable statements for defamation purposes and are protected by the first amendment."), cert. denied, 498 U.S. 1119 (1991); <u>Janklow v. Newsweek, Inc.</u>, 788 F.2d 1300, 1305 (8th Cir. 1986), cert. denied, 479 U.S. 883 (1986).

However, in 1990, the United States Supreme Court, in <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1 (1990), determined that freedom of expression "is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between opinion and fact."  <u>Id.</u> at 20.   Despite this language, the Minnesota Courts, with limited exception, have interpreted <u>Milkovich</u> as clarifying "that only statements regarding matters of public concern[,] which are not sufficiently

factual to be capable of being proven true or false, and statements which cannot be reasonably interpreted as stating actual facts, are absolutely protected by the First Amendment." Geraci v. Eckankar, 526 N.W.2d 391, 397 (Minn.App. 1995), rev. denied (Minn., March 14, 1995); McGrath v. TCF Bank Savings, 502 N.W.2d 801, 808 (Minn.App. 1993), modified on other grounds, 509 N.W.2d 365 (Minn. 1993); Huyen v. Driscoll, 479 N.W.2d 76, 80 (Minn.App. 1991), rev. denied (Minn., February 10, 1992); Lund v. Chicago and Northwestern Transportation Co., 467 N.W.2d 366, 369 (Minn.App. 1991), rev. denied (Minn., June 19, 1991); Hunt v. University of Minnesota, 465 N.W.2d 88, 94 (Minn.App. 1991); but see, Bradley v. Hubbard Broadcasting, Inc., 471 N.W.2d 670, 674 (Minn.App. 1991), rev. denied (Minn., August 2, 1991); Weissman v. Sri Lanka Curry House, Inc., 469 N.W.2d 471 (Minn.App. 1991).

"Only statements that present or imply the existence of a fact that can be proven true or false are actionable under [Minnesota's] defamation law." Merchant Investment & Management Co., Inc. v. St. Anthony West Neighborhood Organization, Inc., supra at 95, quoting Schlieman v. Gannett Minnesota Broadcasting, Inc., 637 N.W.2d 297, 308 (Minn.App. 2001). "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or

surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." Id. [internal quotations omitted].

Whether a statement constitutes an expression of an opinion is a question of law, see, Lund v. Chicago & Northwestern Transportation Co., supra at 369, and depends upon the totality of the circumstances.  See, Gernander v. Winona State University, 428 N.W.2d 473, 476 (Minn.App. 1988).  In making this determination, Minnesota Courts have traditionally applied the framework set forth by our Court of Appeals, in Janklow v. Newsweek, Inc., supra at 1305, see, Hunt v. University of Minnesota, supra at 93-94, which includes an evaluation of the following four factors: "(1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary context in which the statement is made; and (4) the statement's public context." McClure v. American Family Mutual Ins. Co., 29 F. Supp.2d 1046, 1055 (D. Minn. 1998), citing Janklow v. Newsweek, Inc., supra at 1302-03.  Other considerations include "the general tenor of the entire work and its statements, setting, and format; the specific context and content of the statements, including the use of figurative or hyperbolic language and reasonable expectations of the audience; and whether the statement is sufficiently objective to be susceptible of being proved true

or false." Merchant Investment & Management Co., Inc. v. St. Anthony West

Neighborhood Organization, Inc., supra at 96.[4]

If a statement is capable of being proven true or false, "'the dispositive question

* * * becomes whether a reasonable factfinder could conclude that the statements *

* * imply an assertion' that is defamatory." Schlieman v. Gannett Minnesota

Broadcasting, supra at 308, quoting Milkovich v. Lorain Journal Co., supra at 21. "In

determining whether a communication is defamatory, words must be construed in

context," because "a false statement of fact that is defamatory on its face may not be

defamatory when read in context, and a statement that is not defamatory on its face

may, in fact, be defamatory when read in context." Id. Furthermore, "[w]hen

---

[4]Some Minnesota Courts have held that the distinction between "fact" and "opinion" is only relevant in the context of a public person, or public issue claim for defamation. See, Weismann v. Sri Lanka Curry House, Inc., 469 N.W.2d 471, 473 (Minn.App. 1991); Dedefo v. Wake, 2003 WL 21219830 at *2 (Minn.App., May 27, 2003). Those Courts have held that, in the context of a private party/private issue defamation claim, Minnesota common law governs, and that "Minnesota common law makes no distinction between 'fact' and 'opinion.'" Id.

As we noted, in Kovatovich v. K-Mart Corp., 88 F. Supp.2d 975, 989 (D. Minn. 1999), such case law appears to be inconsistent with the holding of the Minnesota Court of Appeals in Lund v. Chicago and Northwestern Transportation Co., 467 N.W.2d 366, 368-69 (Minn.App. 1991), rev. denied (Minn., June 19, 1991). Nevertheless, while Hylla's defamation claim may properly be characterized as a private party/private issue claim, we need not resolve this inconsistency, as we find that Hylla has failed to establish that the statements published by the Union were false.

determining if language has a defamatory meaning, we give the language its 'obvious and natural meaning.'" Bauer v. State, 1996 WL 601647 at *5 (Minn.App., October 22, 1996), rev. denied (December 17, 1996), quoting Phipps v. Clark Oil & Refining Corp., 408 N.W.2d 569, 573 (Minn. 1987).

For obvious reasons, "[t]rue statements, however disparaging, are not actionable." Schlieman v. Gannett Minnesota Broadcasting, supra at 303, quoting Stuempges v. Park Davis Co., supra at 255. A plaintiff cannot succeed in proving the falsity of an assertion, merely by showing that the statement is not literally true in every detail. See, Jadwin v. Minneapolis Star and Tribune Co., 390 N.W.2d 437, 441 (Minn.App. 1991). Therefore, "[i]f the statement is true in substance, inaccuracies of expression or detail are immaterial." Id. Although "the truth or falsity of a statement is inherently within the province of a jury," Keuchle v. Life's Companion, P.C.A., Inc., 653 N.W.2d 214, 218 (Minn.App. 2002), citing Lewis v. Equitable Assurance Society of the United States, 389 N.W.2d 876, 889 (Minn. 1986), "[w]here there is no dispute as to the underlying facts, the question of whether a statement is substantially accurate is one of law for the court." Jadwin v. Minneapolis Star and Tribune Co., 390 N.W.2d 437, 441 (Minn.App. 1986), citing Williams v. WCAU-TV, 555 F. Supp. 198, 202 (E. D. Pa. 1983); see also, Rouse v. Dunkley & Bennett, PA, 520 N.W.2d

406, 410-11 (Minn. 1994); Kellar v. VonHoltum, 568 N.W.2d 186, 191 (Minn.App. 1997)("The question of whether a claimed defamatory meaning is reasonably claimed by the language used is a question of law to be determined by the court."), citing Utecht v. Shopko Dept. Store, 324 N.W.2d 652, 653 (Minn. 1982); Hunter v. Hartman, 545 N.W.2d 699, 709 (Minn.App. 1996).

In the landmark case of New York Times v. Sullivan, 376 U.S. 254, 280 (1964), the Supreme Court established a heightened "actual malice" standard for cases in which a public official claimed defamation, which was subsequently extended to cases involving the alleged defamation of public figures, see, Curtis Publishing Company v. Butts, 388 U.S. 130, 155 (1967), and limited purpose public figures. See, Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974).  The actual malice standard requires that a plaintiff demonstrate, by clear and convincing evidence, that the statement at issue was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  New York Times v. Sullivan, supra at 280.  Minnesota Courts have clarified that actual malice "does not mean that the defendant acted with ill-will or spite."  Chafoulias v. Peterson, 668 N.W.2d 642, 654 (Minn. 2003), citing Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 665-67 (1989); see also, Moreno v. Crookston Times Printing Co., 610 N.W.2d 321, 329 (Minn.

2000)(noting that actual malice "has nothing to do with motive or ill will in the publishing of otherwise defamatory statements.").

Although the presence of malice is generally a fact question, see, Stuempges v. Parke, Davis & Co., supra at 257, Minnesota Courts have held that the question of whether the evidence is sufficient for a finding of malice can be decided as a matter of law. See, Bauer v. State, 511 N.W.2d 447, 450 (Minn. 1994); see also, Frankson v. Design Space International, 394 N.W.2d 140, 145 (Minn. 1986)(finding that evidence of malice was not sufficient to give to a Jury); Buchanan v. Minnesota State Dept. of Health, 573 N.W.2d 733, 738 (Minn.App. 1998); Michaelson v. Minn. Mining & Mfg. Co., 474 N.W.2d 174, 182 (Minn.App. 1991)(affirming Summary Judgment because an employer's letter to a plaintiff employee's supervisor alleging deficiencies in his job performance did not establish actual malice).

2.   Legal Analysis. The Union argues, first, that under Federal labor law, defamation claims arising from labor-management disputes must satisfy the Sullivan actual malice standard, and that we should find that the Plaintiff has failed to meet his burden as a matter of law. The case cited by the Union for this proposition, Linn v. United Plant Guard Workers, 383 U.S. 53 (1966), adopts the actual malice standard for statements made by union officers during labor disputes in

the context of the National Labor Relations Act ("NLRA"), <u>Title 29 U.S.C. §141 et seq.</u>, rather than the LMRDA.  See also, <u>Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union</u>, 39 F.3d 191, 194 (8th Cir. 1994)(State law defamation claims are partially preempted during labor disputes, as defined under Title 29 U.S.C. §152(9)).  Although our Court of Appeals has not ruled on this matter, several other Courts have applied the actual malice standard, which is set forth in <u>Linn</u>, in the context of the LMRDA, based upon the intimate relationship between the goals of the NLRA, and Title I of the LMRDA, to promote uninhibited debate in the union context.  See, <u>Kirk v. Transport Workers Union</u>, 934 F. Supp. 775, 787 (S.D. Tex. 1995)(extending actual malice test to claims brought under Title I of the LMRDA); <u>Henry v. Nat'l Assn. of Air Traffic Specialists</u>, 836 F. Supp. 1204, 1206 (D. Md. 1993)(elected leaders of union are public figures under <u>New York Times v. Sullivan</u>, supra).

In the alternative, the Union argues that, under Minnesota law, an employer has a conditional privilege in the context of the disciplining an employee, that also requires a showing, by the plaintiff, of actual malice.  The elements of conditional privilege, in Minnesota, are as follows:

> The law is that a communication, to be privileged, must be
> made upon a proper occasion, from a proper motive, and

> must be based upon reasonable or probable cause. When so
> made in good faith, the law does not imply malice from the
> communication itself, as in the ordinary case of libel.
> Actual malice must be proved, before there can be a
> recovery, and in the absence of such proof the plaintiff
> cannot recover.

Stuempges v. Park, Davis & Co., supra at 256-57, quoting Hebner v. Great N. Ry., 80 N.W.1128, 1129 (1899); Ferrell v. Cross, 557 N.W.2d 560, 566 (Minn. 1997).

The existence of the qualified privilege is a question of law, that arises from the public policy consideration that statements made on certain occasions, or in certain contexts, should be encouraged, even if, otherwise, they might be considered defamatory. See, Chafoulias v. Peterson, supra at 650; Lewis v. Equitable Life Assur. Soc. of the U.S., supra at 889 (citing cases). In the context of a conditional privilege, Minnesota Courts have held that "[c]ommunications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose * * *." Ferrell v. Cross, supra at 566, quoting McBride v. Sears, Roebuck & Co., 235 N.W.2d 371, 374 (Minn. 1975); Keuchle v. Life's Companion P.C.A., Inc., supra at 220; Rudebeck v. Paulson, 612 N.W.2d 450, 453 (Minn.App. 2000).

In Wirig v. Kinney Shoe Company, 461 N.W.2d 374, 379 (Minn. 1990), the Minnesota Supreme Court considered the applicability of a conditional privilege when an employer communicated allegations of theft against an employee, at a meeting of

both managerial and nonmanagerial employees.  The Court found that the employer's purpose in publishing its accusations -- to guard against future losses and to punish the perpetrators  -- was appropriate, and found that the other employees had a legitimate reason to know about the accusations because of their common interest in operating a successful enterprise.  The Court also considered whether the employer had reasonable grounds to publish its charges against the employee, and specifically considered whether the employer had established probable cause that the employee was guilty of the charged indiscretions, such as by following an established investigatory procedure.  Id. at 380-81.  Ultimately, the Court, in Wirig, found that a conditional privilege did not exist, as the employer had taken no steps to investigate the merits of the claim, and consequently, lacked probable cause to make the potentially defamatory statement.  Id. at 381.

Here, the Union distributed the December 15th Letter to inform all District Chairpersons that Hylla was suspended from office, and had violated his suspension by attempting to conduct Union business independently, while the purpose of the February 17th Letter was to confirm the imposition of a permanent bar against Hylla, which prevented him from ever holding a Union office.  Moreover, the District Chairpersons had a reason to know this information, since Hylla had continued to act,

in his official union capacity, even after his suspension.  In contrast to Wirig, the Union followed established disciplinary procedures, and an Administrative Hearing had already been scheduled on the charges against Hylla, when he was reported for acting in his official capacity, and the Union took the initial step of publishing the circumstances of his suspension.

We believe that the facts before us are insufficient, as a matter of law, to establish a showing of actual malice.  In his Complaint, which is not verified, Hylla alleged that the Union falsely published statements that he had acted in a disrespectful, insubordinate, and threatening manner.  See, Complaint, supra at p. 3.  Hylla elaborated on that position, at the Hearing and argued that he had specifically been defamed by the publication of accusations that he had threatened Gilbertson with bodily harm, which is a criminal offense under Minnesota law, and by the publication of charges that he engaged in conduct unbecoming an officer.[5]  A review of the letters, which were distributed by the Union, reveals that they were carefully and clearly

---

[5]We note that, under Minnesota law, false accusations of criminal activity are defamatory per se.  See, Becker v. Alloy Hardfacing & Eng'g Co., 401 N.W.2d 655, 661 (Minn. 1987).  However, nothing in either the December 15th or February 17th Letter accuses Hylla of a crime, and a finding of per se defamation only eliminates the requirement that a plaintiff show actual damages, and does not waive the requirement that the statements be published to a third party, and be false.

drafted to explain to persons, who were immediately affected by Hylla's suspension, that he had been suspended pending a Disciplinary Hearing, included a copy of the original disciplinary letters sent to Hylla, which listed the charges that had been brought against him, and requested that the matter of Hylla's suspension not be circulated.

Specifically the December 15th Letter states, in relevant part, that Hylla "may have violated our Union's Constitution," and that the allegations, "if true," demonstrate that Hylla should not hold a Union office.  See, Declaration of Kraus, supra at Exhibit 7.  The February 17th Letter likewise summarizes the results of the Disciplinary Hearing that was conducted by the Union, reports that Hylla had been guilty of all but one (1) of the charges brought against him, and notes that Hylla had been barred from holding any Union office in the future.  Id. at Exhibit 12.  Each of those statements was an accurate characterization of the results of the disciplinary proceeding.  The fact that Hylla did not want the District Chairpersons to know that he had been disciplined, or know the nature of the charges against him, is understandable, but to constitute actual malice, Hylla must establish a degree of reckless disregard for the truth of the statements published that is simply not present here.  Contrary to Hylla's assertion, we find no legitimate basis to conclude that the

Union acted recklessly in informing a limited number of Union members, and fellow union officers, of the nature of the charges that had been brought against Hylla, or of the results of the Hearing that affirmed his suspension as a union officer.

Even if the actual malice standard does not apply, we reject Hylla's contention, that he has satisfied the more lenient pleading standard for common law defamation. "A published true statement, however disparaging, is not actionable as defamation." Keuchle v. Life's Companion, P.C.A., Inc., supra at 219. Hylla alleges that the Union published statements, concerning his discipline, that informed third parties that he was charged with acting in a disrespectful, insubordinate, or threatening manner. However, as evidenced by the disciplinary record, including the letters sent to Hylla from the International President, and the decision of the Hearing Officer, those allegations were literally true. The Union **did** accuse Hylla of acting in a manner unbecoming an officer, it properly held an Administrative Hearing, and it ultimately determined that the charges were valid, and that disciplinary suspension should be the result.

There is nothing defamatory about communicating the results of such a disciplinary process to a limited number of employees, especially when the publication was necessitated by Hylla's own attempt to continue to conduct Union

business, notwithstanding his suspension from office. Hylla unquestionably disagrees with the outcome of that disciplinary process, but he has failed to allege any facts that would suggest that the publication of charges, which are clearly labeled as such, and the decision of the Union on those charges, was legally defamatory.

In sum, since Hylla has failed to state a claim for defamation, under Minnesota law, or Federal labor law, we recommend that the Union's Motion for Summary Judgment be granted.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment [Docket No. 8] be granted.

     2.     That the Plaintiff's Motion for Summary Judgment [Docket No. 13] be denied.

Dated:  August 7, 2007                *s/Raymond L. Erickson*
                                        Raymond L. Erickson
                                        CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 24,  2007,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 24, 2007,** unless all interested

- 43 -

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.